Good morning again. We will resume our session with our two patent cases, one of which is Halo Electronics v. Pulse Electronics, 2013, 1472, and 1656. Mr. Woodford. Good morning, and may it please the Court. Halo's appeal focuses on two district court rulings. The first relates to the district court... Actually, I'm not sure this appeal focuses. There are a lot of issues. Oh, there are a lot of issues. A lot of issues, a lot of patents. That is true, and on Halo's side, and I'll put it that way, on Halo's side, we're focusing on two issues. We have the district court's misapplication of the Transocean decision and its impact on the sale or offer for sale within the United States under 271. The second issue is the district court's misapplication of the objective prong of the Wolf and East Coast. The Transocean issue, can we start there? Sure. Because I assume that's where you were going to start. That's where I was going to start. Okay. On the Transocean issue, you don't argue that a sale occurred within the United States, do you? We do. A sale definitely occurred. Okay. So it's not just, you're not just arguing that there was an offer. You're saying that there was a sale in the United States? Yes, and that's interesting that you've raised that, because the district court actually did not address, focused on offer for sale, but did not address the sale, and it's unclear why, because it was certainly argued below. And the facts definitely support a sale here, because what we have is Cisco and Pulse. I'll use Cisco as the example, because a lot of the briefing was focused on that. They have a master agreement that's negotiated in the United States, signed in the United States, by people from the United States, applies California law. With respect to materials that were made outside the United States? Yes. And delivered outside the United States. The agreement, the master agreement, specifically says, it's titled, Key Purchase Terms. It says, We have now reached agreement regarding these key terms, which we intend to be incorporated into the purchase agreement, without further reference to this letter, and that refers to the purchase agreements I'll get to in a second. Then, importantly, it says, Each of us agrees that the provisions of this letter are binding upon us, and all purchases made by Cisco or on our behalf by our contract manufacturers, as of the date of this letter. Now, do you interpret those letters as simply setting a price if and when a sale occurs, or do you interpret those letters more akin to a requirements contract that says, You will meet all these requirements, and you will meet them all at this price, so that, in other words, it is a firm agreement to sell. It is a firm agreement to sell. It is a requirements contract, so it would constitute a sale in the United States. So the parties couldn't just have left that sit, and then there be no sale ever? Well, I think that would get to, I think you would have under the frame, so if you continue on with the request for quotations that are made, the price offer that is made under that framework, and then there's an award by Cisco. You would have an infringing act there. Now, whether or not, if nothing ever happened from that, then there would be a question of damages, like it was in Transocean. There was the issue of damages that was ultimately affirmed, and I think the $15 million reward from a, when it turned out that the rig that came back into the Gulf wasn't actually covered by the claims. So I think that question is a separate damages question. I think the issue here is we have a contract that sets price and all the terms required for a contract in the United States, and once that happens, you have an infringement. Can you clear up for me? I think you got damages for some things, right? And those were things that were ultimately came back to the United States. Are you trying to get damage? Was there something that came back to the United States that you didn't get damages for? So what, how this played out was on summary, so there's roughly, say roughly $300 million worth of sales of these products that are covered by HALOS claims. 90% or so are roughly that amount. The court on summary judgment said these are never shipped back into the United States, and therefore, they're out of the case. So our direct infringement claims were left with just the portion that did come back and were shipped in the United States. What you're trying to get damages for is articles manufactured and delivered and that stay abroad. That stay abroad. With one caveat, there was an inducement aspect to the case, which is not an issue on appeal, that some of those products do come back in. Right, but that's, again, that's covered by, I'm trying to divide up what came back and what didn't. I mean, the stuff that comes back, you clearly have good arguments on. I just don't understand how you're trying to get damages for things that stay abroad. Well, I think because there's a sale in the United States, and I think it's based on 20 years of this court's precedent, that says that those activities are infringement, do constitute an infringement in the United States, going back to Beverly Hills Van and continuing all the way up to and including Transocean, which itself does. I thought our precedent was pretty clear that if the article is manufactured and it stays abroad, that you can't get infringement damages for it. Well, I don't think that specific question has been addressed, but if you look at the precedent. What kind of theory? I mean, you clearly couldn't get per-unit damages or something like that, could you, for things that stay abroad? What kind of theory of damages would you have for things that, even if they're covered technically by a contract made in the United States, are manufactured, delivered, and everything else is done abroad? I think you could get per-unit damages, because what happens here, the economic loss, the detriment to the, and these are all things that come from the case law on this issue, that is all here. It happens in California, actually. That is where the sale is lost. That is where the contracts are signed and the prices are set, and then it's instructed, I would call it fulfillment, because that's actually what's happening. You have a sale in the United States, and then the contract manufacturers go out and fulfill that contract, and, of course, Pulse has its counterparts in China, and they fulfill the contractual terms that are done here. So that business is lost in California, and I think under this court's precedent, that would constitute a sale. What about the other terms? I mean, you say that the letters set out the total quantities and the price that will be paid at that particular quantity, but things like delivery and the exact number that any individual contractor is going to purchase, all of those things are in the purchase orders that occur outside the United States, right? Yeah. Well, the contract in the United States will identify the part numbers, will identify the price that's applied to every purchase between Pulse and any contract manufacturer according to that master agreement, and it sets forth Cisco's estimated demand, and then it sets forth the share of the demand that Pulse will receive. And I think your question, though, fits into this concept of the physical aspects of a sale versus conceptual, and that came up in North American Phillips and has been followed since then, that a sale, the focus, the questions so far have focused on that physical aspect, and I think under the court's precedent, location of the buyer, location of the seller, and those things certainly satisfy the physical aspect, but the cases have pointed out that there's a conceptual dimension to a sale, and the conceptual dimension is where the contracting occurs, where the negotiations occur, the fact that California law applies to these contracts. You can't forget that conceptual basis for where a sale occurs that has been followed by this court for probably 20 years now. So if we think that there's a question mark here about whether the sale actually occurred in the United States, would it be your position that we would have to remand it to the district court to assess the facts to determine whether or not a sale really occurred? I think that is right, and I think the way the test would work out, if there's a sale or an offer for sale, that's a threshold question that needs to be satisfied. Then you look at the activities, both physical and conceptual, that have been set forth in the cases on this issue and look to see where those activities occurred, and then you make a determination, are those activities within the border here, within the United States, are those sufficient to satisfy a sale or an offer for sale? Can you split those two up for me? It seems to me that, or at least I thought you were arguing that there's something different between a sale and an offer for sale in your briefs. Assume we disagree with you that a sale occurred here. Do you think that there's still an offer for sale in the United States that would make, would incur liability? I think there is an offer for sale that would be an infringement. You have, and what you have under that master agreement, the next step that happens is Cisco sends a request for, quote, to Pulse. Pulse provides the pricing. It offers and says, here's the part numbers, here's the prices we're offering. But wasn't that an offer for sale to be made in another country? No, the offer for sale, that activity happens here. It's going to be fulfilled in the future. The offer was for the sale to be made in another country. I see the point you're raising, and it's been a point I think that was in a concurrence in Rotec about the issue of, should an offer for sale focus not on any of the activities but the delivery? When does the sale occur? When title is transferred? No. And I think there's lots of cases that say, and have ruled out the use of FOB terms in the transfer of title. That's a mechanical test that has been rejected by this court many times. And that's the point of the test that I'm talking about and that this court has adopted. Mechanical rules are out. Well, I understand that. Form over substance. It sounds to me like, at least for the goods that didn't come back into the United States, you're saying as long as the offer for sale is made physically in the United States, it doesn't matter whether they're delivered and used and things like that. I think that's right. So, hypothetically, if two Chinese businessmen came to New York and negotiated a sale in a hotel in New York for some reason for the manufacture of goods and delivery in China, that could possibly infringe a U.S. patent. It's possible, but I wouldn't say for sure. I think that's a factual determination. Does an offer for sale in the United States mean an offer to sell the product in the United States? I don't think it necessarily does require that, even though I know there's— If we think it does, do you lose your appeal? I mean, setting aside your argument that there was a sale, there's no offer to sell anything in the United States here. Well, the things that are at issue, the offer for sale, those are delivered and shipped outside of the United States. The sale issue is separate. I understand that. Right. So I think that's the case, although factually we'd have to go back because there are a lot of different scenarios here. We've talked about the Cisco scenario, which is a lot of the sales relate to that issue. But if you look, there's all sorts of other customers that do things slightly different that would be—we'd also have to assess factually as to what's— I'm—sorry. Go ahead. I'm confused by that. I thought that the main bulk of what was on appeal was goods that were delivered, manufactured, all that, outside of the United States, and you're trying to have a very—putting aside your sale argument, a very broad reading of what offer for sale means. And if we disagree with you on that, why doesn't that resolve the appeal? Well, it doesn't resolve. This is where—I think this is where we're having a difference. It does—perhaps resolves it on the offer for sale, but certainly not on the sale. Oh, I understand. But, Doug, I mean, my baseline was we disagree with you that the sale actually occurred here. It seems to me that that's what I'm trying to get at is what your definition of offer for sale is, and it seems like it's a very broad one. Right. Our position is very broad. That is true. Mr. Woodford, do you want to save five minutes? You're well into that. I do. Thank you, Your Honor. We'll give you what you have, $250,000. Mr. Hoogie. Yes, Your Honor. Thank you. Good morning. I'd like to address three of the issues that are before Your Honors today. One is we ask you to affirm Judge Breaux's summary judgment of non-infringement that the Pulse's foreign sales are, in fact, non-infringing. Those contracts, those sales occurred in China. They need a Chinese patent if they want to go after that. Second, we ask you to affirm— And what's the definition of sale which occurred in China? Well, under 271A, in order for an offer to sell to constitute infringement, the offer must be to sell a patented invention within the United States. I'm reading TransOcean. The focus should not be on the location of the offer, rather the location of the future sale that would occur pursuant to the offer. And everything, first of all, I have worked at all the documents that they have cited in the record many times. That goes to the offer for sale issue. So even assuming that we believe that TransOcean was right and that that's the analysis that you undertake on the offer for sale, why wouldn't a completed sale in the United States, even if there was delivery and manufacture elsewhere, be enough under 271A? Because a sale is for something that is not within the United States. It is under the statute. So you're saying the statute doesn't just require a sale. It requires a sale and delivery? Yes. It requires the infringing conduct to be here in the United States. If you prove infringement. For 30 years I have been going into court to prove infringement. One of my issues is that the product that I am accusing of infringement is in the United States. That's one of the elements of proof. But you can have a sale that's infringing even if there's never any delivery. I mean, there's a question of damages, but you don't have to ultimately even have a delivered product to have an infringement with a sale. That's correct. But as Judge Newman said, what we're talking about is contemplating the sale of something that would infringe the patent. And it can't infringe the patent if it's never, ever in the United States. And we can talk from now until kingdom comes, but what we're talking about is the sale of products in China. Even if we're talking about an offer to sell? Offer to sell. First of all, there is no offer to sell in this so-called master agreement. It's not a master agreement. The testimony they cite is that Cisco never buys a single thing from Pulse. So barring that aside, everything happens outside the United States. All the contracts for buying the product are outside the United States. What do you consider these letter agreements to be? They set price. They set quantity. They're even specifically referencing part numbers. These are documents from supply chain attorneys at Cisco wanting to make sure that their customers, their vendors who are printed circuit board makers, are in fact going to have enough product to make the circuit boards. That's all. They're just making sure that from ground up they're going to have supply getting into them. But these prices are pretty binding, aren't they? I mean the evidence suggests that the people down the chain can't deviate from the prices that you negotiated with Cisco. And if that's the case, why doesn't that affect their patent rights? I mean you could, there's some kind of market dilution or something there. If you want to negotiate below market rates from what they're selling, that seems to affect their patent rights. I don't think it does. I don't think they have a right to talk about things that are manufactured and sold overseas. First of all, this doesn't set up prices for accused products. Accused products aren't even identified in this key purchase terms document. It doesn't bind anybody. But suppose they were. I mean really what this means is, and this may be a hole in the statute and not our case law, but it means that if Cisco and an American company want to get sales out of the United States, you just move your operations abroad for those products that are going to be ultimately sold abroad anyway. So you can avoid infringement. I don't think there's any... I mean there's no doubt if you made these products in the United States and shipped them abroad, you could be subject to a patent infringement claim. Yes, absolutely. That's an infringement. Those products were within the United States. Even if the sale is abroad. Even if the sale is abroad, yes. I mean that's absolutely true. These products have got to be in the United States in order for there to be an infringement. Our statute doesn't have a lot of territoriality about it, but I don't see why two people can't have the mental ability to come to an agreement to sell something in China and that not be covered because the product itself has to infringe the patents, and it's not going to infringe the patents. Not here anyway. On willful infringement, we ask you to affirm the judge's finding that there was no willful infringement on the objective prong. Paul said every reason to believe that its defense of obviousness would succeed, and it should have succeeded, and it should succeed here. All eight of those asserted claims are invalid. They're invalid under the... Objective-subjective dichotomy. Should we still apply that after the Supreme Court's decisions in Octane and Highmark? I mean Bard relied on PRE. Highmark relies on PRE. The Supreme Court says we misread PRE. So is there a question about our willfulness jurisprudence right now? I certainly hope not. The only thing I could ask is that the law be followed as it exists now. I don't think this panel can upset the law that's currently... We have Bard. Sure, but if the Supreme Court has called our precedent into question, then we have to take a look at it, don't we? And I reread Octane this morning, and the two main cases we relied on in Bard are discussed in Octane and, frankly, found to be not particularly relevant to the attorney fee situation. It seems to me to be a very similar inquiry. So I kind of have the same question. Why shouldn't Octane at least cause us to reexamine Bard and Seagate? Well, I don't have a... I absolutely don't have a problem in reexamining the law and continue reexamining the law. The fact of the matter is the defense that Bard had... I mean the defense that Pulse had prior to commencement, after commencement, was the same. The prior art, the patents were looked at by an engineer determined to be invalid over Pulse's products. Pulse's products are the basis of the... The claimed inventions are nothing more than obvious variants of Pulse's products. The Western Electric product alone with the treatise, hinge, invalidates every single claim. Every single limitation is in those two references. So, you know, post-commencement... I suppose that if we re-evaluate and gave more discretion to the district court, you'd be on even firmer ground then because the district court ruled in your favor. The district court. I think we're on firm ground in any event because the claims were invalid. They're obvious variants of Pulse's products. You know, if we're going to go back to... These were claims decided by a jury not to be obvious. That's correct, Your Honor. And the court in its general will agreed. That's correct, Your Honor. And we're saying that... An uphill battle. Yes, I do. I understand that, Your Honor. And I'm working hard to do that right now. Yeah, you claim at some point that you thought that there was a pre-verdict JAMAL, but you really don't cite anything in the record that supports that. That's not an issue that we're appealing, Your Honor. I'm assuming Judge Crowe was correct in that. He was there at the trial. I wasn't there. None of us are on this appeal were there. And we're not attacking the, you know, the underlying facts. But we are saying that it doesn't make any difference in this case because there's no distinctions between the prior art and the claims. But we have to assume that the jury made every factual finding in favor of their determination. So we have to assume the jury found no motivation to confine. The jury found factual differences. I mean, I don't know how you get around the fact that there are so many underlying facts that were argued here. You get around it by doing the de novo review of looking at the – assuming what the underlying facts are. And Judge Crowe said what they are in his order. There's no distinctions between the prior art. And then you look to see whether or not the secondary considerations, such as they are, could dislodge that prima facie. There's no such thing as a prima facie case at trial. I mean, haven't you read all of our case law on that? Well, I have. It is – secondary considerations are factors that have to be taken into account before a determination of obviousness can be made. It's all evident. Understood. Understood, Your Honor. All I'm saying is that – The burden is shifting. There's no prima facie case. It's all just one case. Understood. Under KSR, against the background, the obviousness or non-obviousness of the subject matter is determined. Then such secondary considerations as commercial success, long-felt need, et cetera, might be utilized to give light to the circumstances surrounding the origin of the subject matter. Now, we look at the secondary considerations that they show. And what – can they dislodge the fact that one of ordinary skill in the art can get all of the limitations in these very simple patents out of the prior art? They can't. There's no amount of secondary consideration evidence that can overcome that fact. Judge Proh said all the limitations are there in the prior art. You're still speaking the wrong language. There's no dislodging or overcoming. As what KSR said, and as our case law clearly says, that objective indicia of non-obviousness are evidence that gives light to what might have really been understood. So you don't decide what someone understood and then see if you can dislodge it. You look at everything to see what might have been understood. Well, the wires case here that we've cited, you simply cannot overcome a strong prima facie case of obviousness with secondary considerations, especially secondary considerations such as these. We're not talking about assuming some fantasy with secondary considerations. Their secondary considerations are what they are. There's commercial success secondary consideration, which is nothing more than a claim chart and our sales. Their long felt but unsolved need is the ability to satisfy a 256 centigrade oven. And there's not a single limitation in the claims that cover that solution. And claim construction, that's an issue of law for you all. You all are the ultimate arbiters of obviousness. This is a de novo appeal on obviousness. This isn't anticipation. You have to look at, and I'm asking you to look at the differences. Just follow Judge Pro's decision. He came to the wrong conclusion. The wrong conclusion is that one of ordinary skill in the earth would definitely have come to these claims. Look at the claims. There's nothing there. There's not a single limitation that has any patentable weight to it. And in any event, with respect to the dichotomy of Seagate, objective problems, subjective problems, that's all we've got to work with is the law that is at stake here today. I don't know if I have any time left, but I'd like to reserve. You have time left for the cross appeal if there will be something to rebut. Thank you, Your Honor. Mr. Woodford has about 2.49. Thank you, Your Honor. Just a few quick points back on the issue of the location or within the United States issue. The cases say that a sale has multiple locations. There's many cases that say that. The contract itself in Transocean says that the contract itself can be a sale. The cases, I thought I heard Paulson's counsel say that you need delivery in the United States. You absolutely do not. The cases do not require delivery in the United States. And that gets back at the physical versus conceptual issues that were discussed about where a sale occurs in North American Philips and has been followed since then. Do you have a case where the parties negotiated a contract in the United States, but the product was manufactured and delivered and used completely out of the United States that we found was still infringing? That issue has not been before this court. However, I will say that after the district court's decision in Nevada, the Northern District of California took up the same issue because this contractual arrangement that Cisco has is very common because they control prices here. They don't want contract manufacturers controlling prices. That court found that under Transocean, that is a sale, and those would be infringing. Didn't that court simply find that a reasonable jury on those facts might be able to find a sale? Yes. And distinguish this case. And it distinguished this case interestingly on the fact that they said there was no contract here because the district court didn't even assess the contracts and ignored completely the issue of a sale, which was interesting given what the Northern District of California said. So that is why this case was distinguished. But the application of the Northern District, which I know isn't controlling here, that is instructive as to how courts read the precedent. How do we read that as consistent with all that other precedent, though, that says infringing products sold outside of the United States aren't covered by U.S. patents? Because I don't think the case is actually – I mean, that statement standing alone is true. But what the Northern District of California did is looked at all the precedent, the same precedent that we've cited here, North American Phillips, even the cases that went the other way, MEMC. Before you run out of time, could you address the octane highmark question? I think that does really question the framework that's been set up for enhanced damages. I think here the text, you could argue, for 284 is even more flexible than it is for 285. There's no exceptional requirement. It just flat out says the court may increase damages. The dual requirement that's set up for willfulness is similar to the dual requirement that was set up for the issue of fees. You have this court in its – the lower court in its decision talked about objectively baseless or a sham, that sort of language. It makes it very rigid. If you look at the facts we have in this case against Pulse, the same concerns about how you prove willfulness, given the type of conduct that happened here where they didn't really even rely on anything to decide to go forward and infringe. So it's too demanding, just like the standard was for fees. And also the clear and convincing evidence standard, which is present for willfulness, was also criticized by the octane case. Thank you, Mr. Woodford. With respect to the cross appeal, nothing was said about the cross appeal. There's nothing to rebut. So we'll take the case under advisement.